Richard N. ABRAMS, Plaintiff,

v.

**UNITY MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. 99 C 3182.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 4, 1999.

---

Andrew K. Miller, Forman & Miller, Chicago, IL, for Richard N Abrams, plaintiff.

Timothy Joseph Forman, Andrew K. Miller, Christopher M. Puckelwartz, Forman & Miller, Chicago, IL, for Funeral Financial Systems, Ltd., plaintiff.

Edward King Poor, Winston & Strawn, Chicago, IL, for Unity Mutual Life Insurance Company, defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Richard Abrams sued Unity Mutual Life Insurance Company in this diversity suit, alleging that Unity owes him commissions for the sale of insurance policies under an oral agreement whereby Abrams would help Unity develop and market a preneed insurance product. Unity has filed a motion for summary judgment, which we grant for the reasons stated below.

### RELEVANT FACTS

Plaintiff, Abrams, an Illinois resident, owns a number of funeral-related businesses. Defendant, Unity, is a New York domiciled insurance company. In or around 1991, Abrams and Unity began discussing the possibility of a business arrangement regarding preneed insurance. Preneed insurance involves prearranging a funeral before a person's death and funding the costs of the funeral with a life insurance policy. The discussions and draft agreements between the two parties contemplated that Abrams, who had expertise in preneed insurance, would help Unity develop and market a preneed insurance program. In exchange for Abrams' efforts, the parties considered a compensation structure for Abrams which would include paying gross commissions on the insurance products issued.

The discussions about the business arrangement were reduced to a series of six draft agreements, none of which was signed by the parties. However, Abrams was told by Unity that the parties would "work on a handshake agreement." (R. 6, First Am.Compl. ¶ 10.) Each new draft agreement had slightly different terms, but all of the draft agreements had a number of common provisions. First, each draft contained an integration clause that stated that any agreement would "supercede all prior agreements, written or oral" and that "[n]o amendment, waiver or modification of this Agreement shall be valid unless in writing and signed by the parties." (R. 9, Def.'s Statement of Facts ¶ 14.) Each draft also contained a production requirement that stated the contract would terminate if a certain amount of preneed insurance was not sold. In addition to these provisions, each draft also contained open items, as evidenced by blanks where terms were to be filled in and by Abrams' handwritten edits and question marks on the drafts. Abrams recognized that either party could have walked away from any of the draft agreements.

Between 1991 and 1997, Abrams engaged in a number of activities to benefit Unity, under what Abrams alleges was a valid oral contract. Abrams developed preneed insurance products for Unity, educated Unity employees and agents with respect to the preneed insurance program, and marketed the products on behalf of Unity. Specifically, Abrams' efforts included giving seminars to Unity employees, visiting funeral homes on behalf of Unity to market the products, preparing and sending newsletters to funeral homes, and writing a sales manual for distribution to sales agents of funeral homes. In addition, Abrams claims that he "introduced" Unity to the preneed market, in part by making reference in his newsletter, circulated to approximately 10,000 funeral homes, to preneed insurance and Unity. Furthermore, Abrams wrote a monthly column in a trade publication in which he allegedly promoted preneed products generally. Finally, Abrams claims that he

introduced Tony Todd, an insurance agent, to Unity and was owed commissions as a result of that introduction. Although Abrams received a portion of the commissions he was owed by Unity from roughly 1996 to the present, he contends that the commissions were inadequate under the putative oral agreement.

Abrams filed suit, asking this Court to enforce the terms of an oral agreement that, he says, was reached by the parties. Abrams asserts breach of an oral contract, promissory estoppel, and unjust enrichment. Currently pending before this Court is Unity's motion for summary judgment. For the reasons that follow, the motion is granted.

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. *Crim v. Bd. of Educ. of Cairo School Dist. No. 1*, 147 F.3d 535, 540 (7th Cir.1998). However, if the evidence is merely colorable, is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505. "Summary judgment is particularly appropriate in cases involving the interpretation of contracts." *Murphy*

*v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564–65 (7th Cir.1995).

### II. Choice of Law

■ Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court must apply Illinois' choice of law rules in diversity cases. In the context of contract law, the Illinois Supreme Court applies the Second Restatement's "most significant contacts" test. *See CSX Transp., Inc. v. Chicago & N.W. Transp. Co.*, 62 F.3d 185, 188 (7th Cir.1995); *Wildey v. Springs*, 47 F.3d 1475, 1481 (7th Cir.1995). The most significant contacts test directs courts to consider five factors in determining choice of law in contract cases: (1) the place of contracting; (2) the place of negotiations; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Curran v. Kwon*, 153 F.3d 481, 488 (7th Cir.1998); *Palmer v. Beverly Enters.*, 823 F.2d 1105, 1109–10 (7th Cir. 1987); *Obras Civiles, S.A. v. ADM Sec., Inc.*, 32 F.Supp.2d 1018, 1021 n. 2 (N.D.Ill. 1999).

■ Unity argues that under the most significant contacts test, New York law must govern this case.[1] We agree. First, consideration of the place of negotiations favors New York. The parties met in New York four or five times and only once in Illinois. In addition, the draft agreements strongly suggest that the location of the subject matter of the contract would be New York and New Jersey; the final draft broadened the territory to the Atlantic region. The other three factors are not of assistance in the choice of law determination. The written drafts were never signed and thus there was no place of contracting. Furthermore, there is no suggestion by either party of where an oral contract may have been executed. Similarly, it is not clear where the place of

1. Abrams neither refutes nor adopts Unity's assertion that New York law governs this case. However, he argues his position under New York law.

performance would have been, presumably the location could either be the New York area because that is where the preneed insurance products were to be marketed and sold or in Illinois because that is where Abrams argues that correspondence and other work-product was initiated. The record is not clear as to where the work that Abrams claims to have done for Unity, *e.g.* holding seminars and training sessions with Unity employees, visiting over one hundred funeral homes, and preparing newsletters, was actually performed. Finally, Abrams was a resident of Illinois, while Unity was domiciled in New York, and so this factor likewise does not lend any guidance to the choice of law determination. Therefore, under the facts in this case, New York has the most significant contacts, and so we will analyze Abrams' claims under New York law.

## III. Was There an Enforceable Contract?

■ The central issue in this case is whether there was an enforceable oral agreement between the parties.[2] Under New York law, an oral contract must have sufficiently definite terms to be enforceable. *Muhlstock v. Cole*, 245 A.D.2d 55, 58, 666 N.Y.S.2d 116 (N.Y.App.Div.1997); *Charles Hyman, Inc. v. Olsen Indus.*, 227 A.D.2d 270, 275, 642 N.Y.S.2d 306 (N.Y.App.Div.1996). The putative oral agreement in this case lacks many important terms, *e.g.* Abrams is not certain when the parties were actually bound by the handshake agreement; what the actual duration of the contract was; if a production requirement was part of the contract.

■ In addition, if the parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until those events actually occur. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) (interpreting New York law). There are four factors which courts consider in determining whether there is an intent to be bound

only by a written agreement: (1) the parties' explicit statements concerning their intent to be bound; (2) whether there has been partial performance of the contract; (3) whether all the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998); *R.G. Group*, 751 F.2d at 75–76.

### A. The Language of the Agreement

■ Considerable weight is given to a party's explicit statement that it does not wish to be bound until there is a written and signed agreement. *Adjustrite*, 145 F.3d at 549 (explaining that the first factor, language of the agreement, is the most important); *R.G. Group*, 751 F.2d at 75. "When a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent." *R.G. Group*, 751 F.2d at 75.

Here, the parties signaled their intent to be bound by a written agreement via the integration clause contained in all six draft agreements:

> This Agreement, and the attachments which are made a part of it, constitute the entire understanding of the parties and supersede all prior agreement, written or oral, between the parties pertaining to the subject matter of this Agreement. No amendment, waiver or modification of this Agreement shall be valid unless in writing and signed by the parties.

(R. 9, Def.'s Statement of Facts ¶ 14.) Abrams had many opportunities during the nearly two years in which the draft agreements were being negotiated to remove the integration clause, but he never did. His inaction establishes an intent not to be bound until execution of formal documents. *Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.1984) (mutual

---

**2.** Abrams does not allege that there was a    valid written agreement.

intent not to be bound prior to execution of formal documents conclusively established when neither party objected, during the course of bargaining, to provisions of proposed draft contracts which stated that "when executed and delivered, this ... Agreement and each of the Purchase Agreements will be a valid and binding agreement").

The sole expression which shows that the parties wished to be bound without a written agreement was a statement by a Unity employee that Unity wanted to work on a handshake agreement. However, even this alleged statement never explicitly waived the integration clause, which consistently appeared in each of the drafts, and therefore cannot serve to negate the parties' written intentions. *See R.G. Group*, 751 F.2d at 76 (attorney's statement that the parties had a handshake agreement did not change parties' intent to wait for a writing because that statement made no explicit reference to a waiver of the requirement that the contract be in writing). Therefore, this factor weighs against the existence of an enforceable oral agreement.

### B. Partial Performance

The second factor to consider is whether there has been partial performance on the contract. If so, this suggests that there was an enforceable oral contract. Abrams contends that his work in creating the preneed products and helping Unity's sales people, among other activities, shows that he partially performed on the contract. In addition, he argues that Unity's acceptance of his partial performance is evidenced by Unity's issuance of commission checks to him. Unity counters that Abrams' work was merely preparatory and not in partial performance of any contract; Unity does

not address the question of why commission checks were sent. For purposes of determining this motion, we will assume that there was partial performance. Therefore this factor favors the existence of a valid oral contract.

### C. Open Terms

The third factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to. *Id.* at 76. In this case, the drafts of the agreement make clear that there were many open terms left to be resolved. The handwritten notes and crossed-out terms on the drafts demonstrate, and Abrams, himself, admits that there were still open items. Importantly, there is no specified duration in the drafts, and the drafts are blank where dates would have been inserted. Abrams' deposition makes clear that the duration of the agreement was never established. Abrams does not even know if there was a production requirement in the alleged oral agreement. Therefore, this factor favors Unity's position that the parties did not intend to be bound prior to the execution of a written agreement.

### D. Type of Contract

Finally, the fourth factor is whether the agreement is the type of contract that is usually committed to writing. *Adjustrite*, 145 F.3d at 551. The existence of six drafts which were prepared and heavily marked up demonstrates that the parties, themselves, felt that the agreement should be in writing. To view the drafts otherwise would render the nearly two years of negotiating over written draft agreements an exercise in futility. In addition, given the fairly complicated compensation structure that Abrams alleges,[3] it is unlikely

---

**3.** Abrams alleges that he was to be paid gross commissions as follows: (1) 5% of the premium paid to Unity for all final expense and/or preneed insurance products issues, whether submitted by Unity's captive agents or any other agent; (2) a minimum of 15% of the premium paid to Unity for all final expense

and/or preneed insurance products issued submitted by Abrams directly where Unity has no captive agents; (3) 2% of the premium paid to Unity for annuity contracts issued whether submitted by Unity's captive agents or any funeral home; (4) a minimum of 6% of the premium paid to Unity for annuity con-

that the parties would have relied solely on an oral agreement. Thus, this factor also weighs in favor of Unity's position.

In this case, three of the four factors strongly point to the conclusion that the parties did not intend to be bound until the formal documents were negotiated, executed and delivered. The one factor that arguably supports a contrary conclusion, partial performance, is not sufficient to raise a genuine issue for trial. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72–73 (2d Cir.1989) (finding that even if there is considerable part performance, where a party shows an intent not to be bound before a final contract is signed, there is no binding agreement).

## IV. Statute of Frauds

■ In any case, the oral contract alleged by Abrams violates New York's statute of frauds. N.Y.Gen.Oblig.Law § 5–701(a). The oral agreement in this case falls either within Section 5–701(a)(1) (barring oral agreements that cannot be performed within one year) or Section 5–701(a)(10) (barring oral agreements to pay a commission for services rendered in connection with the negotiation of the purchase, sale or exchange of a business opportunity). If an oral agreement falls within the statute of frauds, it is unenforceable unless subject to an exception. Abrams does not take issue with the fact that the oral contract, by its terms, falls within the statute of frauds. Instead he argues that the agreement comes within the partial performance exception to the statute.

Abrams contends that because he has fully performed and Unity has partially performed, the oral agreement is saved by the partial performance exception to the statute of frauds. However, a contract falling under Section 5–701 requires full performance by both sides to take it out of

the statute of frauds; part performance is insufficient. Thus, even Abrams' claimed full performance is not sufficient to avoid the statute of frauds. *See Tyler v. Windels*, 186 A.D. 698, 700, 174 N.Y.S. 762 (N.Y.App.Div.1919) (under the decisions in the State of New York nothing short of full performance by both parties will take the contract out of the operation of the statute), *aff'd*, 227 N.Y. 589, 125 N.E. 926 (1919); *Meyers v. Waverly Fabrics*, 65 N.Y.2d 75, 489 N.Y.S.2d 891, 479 N.E.2d 236, 238 (1984) (full, unilateral performance by plaintiff insufficient to take oral contract out of the statute); *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 670 N.Y.S.2d 973, 694 N.E.2d 56, 59 (1998) (nothing short of full performance by both parties is required to take an oral agreement out of the statute of frauds).

## V. Promissory Estoppel

■ Abrams argues that the doctrine of promissory estoppel, an exception to the statute of frauds, applies in this case and allows him to recover on the alleged oral contract. To establish the elements of promissory estoppel, Abrams must demonstrate that Unity made a clear and unambiguous promise to him and that he suffered an injury as the result of his reasonable, foreseeable reliance on that promise. *Celi v. Canadian Occidental Petroleum Ltd.*, 804 F.Supp. 465, 470 (E.D.N.Y.1992). To prevail on a claim of promissory estoppel to bar a statute of frauds defense, the circumstances must be "such as to render it unconscionable to deny the oral promise upon which the promisee has relied." *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1125 (S.D.N.Y. 1987). In this case, there was no clear and unambiguous promise to Abrams. As was discussed above, the entire history of the parties' negotiations makes clear that there were substantial open items and dis-

tracts issued submitted by Abrams directly where Unity has not captive agents; and (5) on all "rollovers," Abrams was to negotiate a commission with Unity. If a commission

could not be negotiated between Unity and Abrams, Abrams had the option to submit the "rollover" business to another insurance carrier of his choice. (R. 6 First Am.Compl. ¶ 8.)

agreements as to what the specific promise would be under the contract. Abrams cannot, even now, explain concretely the terms of the putative agreement.

In addition, Abrams has not satisfied the unconscionable injury requirement. Unconscionable injury is an "injury beyond that which flows naturally ... from the nonperformance of the unenforceable agreement." *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir.1994); *see also Rosenthal*, 674 F.Supp. at 1125 (injury resulting solely from nonperformance of void agreement is not sufficiently unconscionable to allow a party to estop reliance on the statute of frauds defense). Because the strongly held public policy underlying New York's statute of frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result, the doctrine of promissory estoppel is reserved for those cases where "the circumstances are such as to render it unconscionable to deny the promise upon which the plaintiff has relied." *Paper Corp. v. Schoeller Technical Papers, Inc.*, 724 F.Supp. 110, 118 (S.D.N.Y.1989). This is a very high threshold and claims of lost fees or nonpayment of fees generally do not rise to the level of unconscionable action. *See, e.g., Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir.1977) (affirming district court's dismissal of complaint in which Plaintiff's only substantial injury was the loss of a fee); *Steinborn v. Daiwa Sec. Am., Inc.*, No. 92 Civ. 0782(JES)(THK), 1995 WL 761286, at *6 (S.D.N.Y. Dec. 26, 1995) (same), *aff'd*, 104 F.3d 351, 1996 WL 547197 (2d Cir.1996) (unpublished table decision); *Rosenthal*, 674 F.Supp. at 1125 (S.D.N.Y.1987) (finding nonpayment of fees under alleged contract insufficient). In this case, Abrams merely seeks lost fees for services rendered. Denying such a claim is not unconscionable.

## VI.  Unjust Enrichment

As an alternative ground for recovery, Abrams relies on a theory of unjust enrichment. To state a claim for unjust enrichment, a plaintiff must plead that: (1) the defendant has been unjustly enriched; (2) the enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust. *Ellis v. Provident Life & Accident Ins. Co.*, 3 F.Supp.2d 399, 411 (S.D.N.Y.1998). However, in this case, we need not undertake an evaluation of each of these elements because Abrams' unjust enrichment claim is based on an underlying oral contract that is unenforceable under the statute of frauds. A plaintiff may not circumvent the statute of frauds by claiming unjust enrichment. *American–European Art Assoc., Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 171 (N.Y.App. Div.1996); *Tallini v. Business Air, Inc.*, 148 A.D.2d 828, 830–31, 538 N.Y.S.2d 664 (N.Y.App.Div.1989) ("[P]laintiff's claim that he was denied commissions which he was entitled to under a theory of unjust enrichment depends on proof of the oral contract and therefore is ... barred by the Statute of Frauds."). Because the oral argument is unenforceable under the statute of frauds, Abrams' unjust enrichment claim fails.

## CONCLUSION

Because Abrams has not produced any evidence from which a reasonable jury could find in his favor, we grant summary judgment in favor of Unity and against Abrams. (R. 8–1.) We instruct the Clerk of Court to enter judgment accordingly pursuant to Federal Rule of Civil Procedure 58.